UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 0:25-CV-61607-MD

SHERLEY HILARY MANCEBO
NAVARRO,

        Plaintiff,

v.

DMI GC HOLDINGS, LLC,

        Defendant.

## DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS PENDING ARBITRATION

Defendant DMI GC Holdings, LLC ("Defendant") hereby files the instant Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration and states the following in support of this Motion:

## I.    INTRODUCTION

The United States Supreme Court requires courts to enforce private arbitration agreements according to their terms pursuant to the Federal Arbitration Act ("FAA"). *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53-54 (1995). As a condition of her employment, Plaintiff Sherley Hilary Mancebo Navarro agreed to a Dispute Resolution Agreement with DMI GC Holdings, LLC ("Defendant").[1] Specifically, Plaintiff and Defendant agreed to the following:

> **All disputes covered by this Agreement will be decided by a single arbitrator through final and binding arbitration and not by way of court or jury trial**.

[1] A true and correct copy of the Agreement is attached as Exhibit 2 to the Declaration of Gene March ("March Decl."), which is attached as Exhibit A. A true and correct copy of documents evidencing Plaintiff's electronic acceptance of the Arbitration Agreement is attached as Exhibit 1 to the Declaration of Gene March. Mr. March is Defendant's Learning Management Administrator.

*See* March Decl. at Ex. 2, ¶1 (emphasis in original). The Dispute Resolution Agreement further provides:

> YOU AGREE TO USE AN ELECTRONIC SIGNATURE TO DEMONSTRATE YOUR ACCEPTANCE OF THIS AGREEMENT. YOU FURTHER UNDERSTAND THAT AN ELECTRONIC SIGNATURE IS AS LEGALLY BINDING AS AN INK SIGNATURE. BY PROVIDING YOUR ELECTRONIC SIGNATURE, YOU ARE ACKNOWLEDGING YOU HAVE READ, REVIEWED, AND AGREE TO THIS AGREEMENT TO ARBITRATE.

*Id.* at ¶10.

Despite the Dispute Resolution Agreement, on July 7, 2025, Plaintiff filed the instant action against Defendant in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, which Defendant removed to this Court on August 8, 2025 (based on diversity jurisdiction). In her Complaint, Plaintiff alleges that Defendant subjected her to gender, pregnancy and disability discrimination in violation of the Florida Civil Rights Act ("FCRA").

The Court is bound by the U.S. Supreme Court, the Court of Appeals for the Eleventh Circuit, and Florida court precedent to enforce the Dispute Resolution Agreement, compel Plaintiff's claims to arbitration, and stay the case. Courts routinely enforce arbitration agreements like the one here, and the Dispute Resolution Agreement's express language and the public policy interests favoring arbitration require Plaintiff to arbitrate her claims against Defendant.

Plaintiff disputes that she entered into any agreement to arbitrate with Defendant, but her claim is simply not true. Accordingly, Defendant requests that this Court compel arbitration in accordance with the terms of the binding Dispute Resolution Agreement that exists between the parties, and stay these proceedings pending the completion of arbitration.

## II.    STATEMENT OF FACTS

### A.    Description Of The Process By Which Employees Are Provided With And Agree To The Dispute Resolution Agreement

Defendant uses the SuccessFactors software system for various human resources functions, which is a third party system developed and maintained by SAP. *See* March Decl. at ¶4. SAP is a globally recognized provider of secure, enterprise-level software solutions.  SAP maintains data certifications and security protocols that ensure the accuracy, reliability, and immutability of all transactions conducted within SuccessFactors. *Id.* at ¶5.  SuccessFactors consists of multiple modules or electronic systems, including Recruiting, Onboarding, Performance, Compensation, Learning Management System ("LMS"), and Employee Central.  *Id.* at ¶6. Each SuccessFactors module has different capabilities. *Id.* Defendant utilizes two different SuccessFactors' modules for document review and signature: one for prospective employees and another for active employees. *Id.* at ¶7.

The first SuccessFactors module administers pre-hire documents, which include general documents provided to all new hires company-wide (although some additional pre-hire documents may also be required based on an employee's state of employment or specific job title). *Id.* at ¶8. At the time Plaintiff was hired, the SuccessFactors module utilized for administration of pre-hire documents was called Onboarding. *Id.* at ¶9. Once a prospective employee receives and signs a conditional offer letter, the Onboarding module sends pre-hire paperwork to the prospective employee's personal e-mail address. *Id.* at ¶10.  The Onboarding module utilizes Adobe and/or Docusign for prospective employees to review and sign their pre-hire documents.  *Id.* at ¶11. Because of Onboarding's use of Adobe and/or Docusign, the pre-hire documents are affixed with a font-driven signature when the employee electronically signs each document.  *Id.* at ¶12.

After a prospective employee completes the pre-hire documents, and their employment is finalized (*i.e.*, no longer conditional), Defendant creates the new employee's company e-mail, SuccessFactors login credentials, and all other relevant credentials. *Id.* at ¶13. Each user's unique ID is created in the Human Resources section of the system and serves as a primary key in the database. *Id.* at ¶14. These IDs are tied to individual employees and cannot be changed or reassigned. *Id.*

At the start of new hire training, employees receive a generic username and password to log into their computer. *Id.* at ¶15. They are then prompted to create a unique password, which must be updated every 45 days due to system requirements. *Id.* With those credentials, the employee can then log into the main employee portal of SuccessFactors and access the other modules, including the LMS module. *Id.* at ¶16. As part of the new hire training, employees are guided through accessing various systems, including SuccessFactors and LMS. *Id.* at ¶17. Once employees access LMS, they are presented with a system-generated list of required new hire trainings, policies, and agreements. *Id.*

Once authenticated, all actions taken by a user within the LMS are recorded in an audit trail, including training completions, electronic signatures, and administrative transactions. *Id.* at ¶18. Each entry in the audit trail is timestamped and associated with a unique system-generated user ID. *Id.* Users may access their learning history at any time and view a complete record of their training activity and signed agreements, including timestamps and statuses. *Id.* at ¶19.

Administrative actions within the LMS are also subject to audit tracking, and the system records the unique user ID for every administrative transaction. *Id.* at ¶20. These logs are immutable and are retained as part of the system's integrity protocol. *Id.* Access to the LMS database backend is restricted to SAP. *Id.* at ¶21. Defendant does not have any ability to modify

or alter the underlying database, aside from generating reports through approved channels. *Id.* Due to the audit trail, user-specific authentication, and backend security protocols, it is not possible for any user or administrator to falsify, alter, or delete a record without the system logging a corresponding transaction entry. *Id.* at ¶22.

Defendant uses the LMS to provide employees with access to its DRA. *Id.* at ¶24-26. LMS enables employees to review the DRA, acknowledge receipt, and confirm their agreement to abide by its terms and conditions. *Id.* at ¶26. The process by which new hires receive, review, and accept the DRA, including its arbitration provision, has remained unchanged since the DRA was first implemented several years ago. *Id.* at ¶27.

Employees may take as much time as needed to review the full text of the DRA. *Id.* at ¶28. To complete the process, employees must check a box acknowledging the terms and confirming their agreement to be bound by the DRA, and when the employee clicks "Agree," that action serves as the employee's electronic signature and is recorded in their LMS audit trail. *Id.* The document specifically states: "By clicking 'Agree,' you are indicating that you have read and understand the foregoing document and consent to the terms of the document, and agree to use your electronic signature to demonstrate your acknowledgement and consent. Your electronic signature is as legal as a handwritten signature." *Id.* at ¶29.

When an employee logs into SuccessFactors with their unique credentials, and then opens a document pending in the LMS, and clicks "Agree" at the bottom of the screen, the system automatically creates an audit trail for all transactions (i.e. every action taken within the system). *Id.* at ¶30. This audit trail captures the exact date, time, and user ID tied to the documents reviewed and acknowledged. *Id.* Once generated, this audit trail cannot be altered or edited by anyone, serving as secure verification (akin to a digital fingerprint) that the employee reviewed and agreed

to the terms. *Id.* It verifies not only that the agreement was electronically signed, but that it was done so by that specific employee under their secure profile. *Id.*

Documents signed post-hire by active employees through the LMS module will not include a font-based signature in the same way the pre-hire documents do through the Onboarding module. *Id.* at ¶31. Instead, in LMS, an employee's electronic signature is captured and attributed through the audit trail provided by the LMS module. *Id.*

**B.      Plaintiff Agreed To Arbitrate Claims Arising Out Of Her Employment With Defendant As A Condition Of Employment**

Plaintiff began her employment with Defendant on October 10, 2022. *See* Plaintiff's Complaint at ¶8.  As a condition of her employment, Plaintiff executed the DRA, via the LMS system, as part of the new hire training process. *See* March Decl., Ex. 1. Plaintiff agreed to arbitrate all employment-related claims against Defendant, including those under state law (*i.e.,* the FCRA):

> Except as it otherwise provides, this agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration, including without limitation, to disputes arising out of or relating to the application for employment, background checks, privacy, employment relationship, or the termination of that relationship (including post-employment defamation or retaliation), trade secrets, unfair competition, compensation, classification, minimum wage, expense reimbursement, overtime, breaks and rest periods, or retaliation, discrimination, or harassment (except claims relating to sexual harassment and sexual assault that may not be subject to pre-dispute arbitration agreement under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act) and claims arising under the Fair Credit Reporting Act, Defend Trade Secrets Act, Civil Rights Act of 1964, 42 U.S.C. §1981, Rehabilitation Act, Civil Rights Acts of 1866 and 1871, Civil Rights Act of 1991, 8 U.S.C. § 1324B (Unfair Immigration Related Practices), 41 U.S.C. § 4712, Pregnancy Discrimination Act, Equal Pay Act, Americans with Disabilities Act, Age Discrimination in Employment Act, Older Workers Benefit Protection Act, Occupational Safety and Health Act, Family and Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the company

and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Consolidated Omnibus Budget Reconciliation Act of 1985, the False Claims Act, and state statutes or regulations, if any, addressing the same or similar subject matters, and all other federal or state legal claims (including without limitation torts) arising out of or relating to your application, selection, employment, or the termination of employment.

Additionally, except as this agreement otherwise provides, the arbitrator, and not any court, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this agreement, including, but not limited to any claim that all or any part of this agreement is void or voidable.

* * *

**YOU AGREE TO USE AN ELECTRONIC SIGNATURE TO DEMONSTRATE YOUR ACCEPTANCE OF THIS AGREEMENT. YOU FURTHER UNDERSTAND THAT AN ELECTRONIC SIGNATURE IS AS LEGALLY BINDING AS AN INK SIGNATURE.**

**BY PROVIDING YOUR ELECTRONIC SIGNATURE, YOU ARE ACKNOWLEDGING YOU HAVE READ, REVIEWED, AND AGREE TO THIS AGREEMENT TO ARBITRATE.**

*Id.* (emphasis in original).

There was no specific time limit for Plaintiff to review and accept the DRA in a single sitting, affording her adequate time to read, review, and accept the agreement. *Id.* Plaintiff agreed she could not sue in court. *See* March Decl., Ex. 1. She waived her right to a jury trial and agreed to submit all claims between herself and Defendant to binding arbitration. *Id.*

Plaintiff's agreement to the terms of the DRA was tracked (and confirmed) via an audit trail, which includes information regarding the date and time on which a particular document was

accessed and signed.   March Decl. at ¶¶27-31. Plaintiff accepted the terms and conditions of the

DRA as reflected in her secure SAP audit trail.  *Id.* at ¶¶ 33–36 and at Ex. 1.

### III.   LEGAL ARGUMENT

#### A.   Relevant Applicable Law Regarding Arbitration Agreements

The Supreme Court has ruled that agreements to arbitrate workplace disputes must be

enforced by federal courts pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §2.  *See*

*Circuit City Stores, Inc. v. Saint Clair Adams*, 532 U.S. 105 (2001).  The FAA requires district

courts to either stay or dismiss the underlying lawsuit and compel arbitration of claims covered

by  a written and enforceable arbitration agreement. *See* 9 U.S.C. §3; *CompuCredit Corp. v.*

*Greenwood*, 132 S. Ct. 665, 669 (2012) (the FAA "requires courts to enforce agreements to

arbitrate according to their terms").  It does so as part of a Congressional mandate recognizing

the value in arbitration and establishing a strong public policy favoring arbitration.  *See Buckeye*

*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (explaining the FAA was enacted

"[t]o overcome judicial resistance to arbitration"); *Gilmer v. Interstate/Johnson Lane Corp*., 500

U.S. 20, 31 (1991) (the FAA permits private parties to "trade[] the procedures . . . of the courtroom

for  the  simplicity,  informality,  and  expedition  of  arbitration").   The  FAA  amounts  to  a

"congressional declaration of a liberal federal policy favoring arbitration agreements."  *Perry v.*

*Thomas*, 482 U.S. 483, 489 (1987) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp*., 460 U.S. 1, 24 (1983)).  Consistent with that declaration, courts should address arbitration

through "[a]n expeditious and summary hearing, with only restricted inquiry into factual issues."

*Moses H. Cone*, 460 U.S. at 22 (noting clear congressional intent "to move the parties to an

arbitrable dispute out of court and into arbitration as quickly and easily as possible").

The FAA requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement, consistent with the principle that arbitration is a matter of contract. 9 U.S.C. §4. "[T]he threshold questions a district court must answer when determining whether a case may be properly referred to arbitration are: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the scope of the agreement." *Hudson Global Res. Mgmt. v. Beck*, 2006 U.S. Dist. LEXIS 40904, at *15 (M.D. Fla. 2005). Although federal courts apply state contract law in determining the existence of an agreement to arbitrate, "federal policy *favoring* arbitration, is taken into consideration even in applying ordinary state law." *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1368-69 (11th Cir. 2005) (emphasis added, citation omitted). In any event, Florida likewise favors arbitration as a matter of public policy. *KFC Nat'l Mgmt. Co. v. Beauregard*, 739 So. 2d 630 Fla. 5th DCA (1999).

### B.  The Arbitration Agreement is Valid and Enforceable

It is clear that the parties entered into an enforceable arbitration agreement, the determination of which is governed by ordinary contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the Arbitration Agreement (in the DRA) contains the requisite elements of offer, acceptance, and consideration necessary for contract formation. *Corbin v. Affiliated Computer Servs.*, 2013 U.S. Dist. LEXIS 92007 (M.D. Fla. Apr. 15, 2013) (applying Florida law in determining that the parties entered into an agreement to arbitrate). Plaintiff was provided with the Arbitration Agreement via the LMS system, and she accepted the DRA by clicking "Agree," which served as her electronic signature to the document agreeing to submit any eligible disputes to final binding arbitration.  This is confirmed by the corresponding audit trail.  *See* March Decl. at ¶36 and at Ex. 1.

The DRA also notes that it applies "to any dispute, past, present, or future, that the Company may have against you." *Id.* at Ex. 2. In the case of an arbitration agreement, reciprocal promises by each party to arbitrate, and thereby giving up their rights to a jury trial, is sufficient consideration to support the agreement. *See e.g., Kinko's, Inc. v. Payne*, 901 So. 2d 354, 356 (Fla. 2d DCA 2005) ("[i]n the present case, there was sufficient consideration given by both parties, as both Kinko's and Payne are bound by the agreement to submit their disputes to arbitration"). In other words, "[w]here both parties are bound by contractual provisions, mutuality exists and those terms are held enforceable." *Id*. (internal citation omitted). Thus, under well-established Florida law, Plaintiff has a binding arbitration agreement with Defendant requiring her to submit her employment-related claims to arbitration. *See e.g., Mackler v. Fitness Int'l, LLC,* 2016 U.S. Dist. LEXIS 184936 (S.D. Fla. Apr. 22, 2016) (granting motion to compel arbitration of employment-related claims).[2]

### C.    <u>Plaintiff's Claims Are Within The Scope Of The Arbitration Agreement</u>

The claims asserted by Plaintiff in the instant action include alleged gender, pregnancy and disability discrimination in violation of the Florida Civil Rights Act ("FCRA"). These claims fall squarely within the type of claims she agreed to arbitrate with Defendant. As discussed above, the Agreement to Arbitrate applies to "any dispute arising out of or related to Employee's [] application

---

[2] Electronic signatures are just as valid as handwritten signatures. *See* 15 U.S.C. §701 ("[w]ith respect to any transaction in or affecting interstate or foreign commerce . . . a signature, contract or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and . . . a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation"). Even if Plaintiff had not electronically signed the agreement (which she did) it would not matter. The Eleventh Circuit has expressly stated that "while the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties." *Id* at *Caley, 428 F. 3d at 1368*. No signature is required, and the fact that the Arbitration Agreement is in writing is all that is required to satisfy the FAA. *Id; see also Wiles v. Palm Springs Grill, LLC,* 2016 U.S. Dist. LEXIS 106297, *5 (S.D. Fla. Aug. 11, 2016); *Santos v. Gen. Dynamics Aviation Servs. Corp.,* 984 So. 2d 658, 660-61 (Fla. 4th DCA 2008).

or selection for employment, employment, and/or termination of employment with either Qualfon Data services Group, LLC, DMI GC Holdings, LLC, Brian Unlimited Distribution Company or one of their affiliates, subsidiaries, or parent companies." *See* March Decl. at Ex. 2. It expressly notes that it applies to claims of discrimination under federal and state law. *Id.* Based on this clear language, Plaintiff cannot legitimately claim that her claims are not subject to arbitration. Accordingly, this Court should compel Plaintiff's claims to binding arbitration, based on the express terms of the DRA.

      **D.**    **The Instant Action Should Be Stayed Pending Arbitration**

      The Federal Arbitration Act, in relevant part, states as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Accordingly, a stay of the instant action pending the completion of arbitration is the proper result. *See e.g. Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698, 699 (11th Cir. 1992) (action should be stayed pending arbitration).

**IV.**    **CONCLUSION**

      The parties to the instant action entered into a valid and enforceable arbitration agreement and the claims raised by Plaintiff are covered by that agreement. Accordingly, Defendant respectfully requests that the Court grant this Motion and enter an Order staying the instant action and compelling Plaintiff to proceed with her claims in arbitration, in accordance with the terms of Defendant's Dispute Resolution Agreement.

**<u>CERTIFICATION OF GOOD FAITH CONFERENCE</u>**

Pursuant to Local Rule 7.1(a)(3), the undersigned counsel hereby certifies that they conferred with counsel for Plaintiff in an effort to secure an agreement regarding this motion and the relief requested. Plaintiff's counsel indicated that Plaintiff opposes this motion.

DATED this 15th day of August 2025.             Respectfully submitted,

<div style="margin-left:50%">

**LITTLER MENDELSON, P.C.**
Miami Tower
100 SE 2nd Street, Suite 3210
Miami, Florida  33131
Tel: (305) 400-7500

/s/ Elizabeth J. Stewart
   Aaron Reed
   Florida Bar No. 557153
   E-mail:  areed@littler.com
   Elizabeth J. Stewart
   Florida Bar No. 1059581
   E-mail:  elstewart@littler.com

*Attorneys for Defendant*

</div>

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that on this 15th day of August 2025,  a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below, and also via any additional manner noted below.

<div style="margin-left:50%">

/s/ Elizabeth J. Stewart
Elizabeth J. Stewart

</div>

**<u>SERVICE LIST</u>**

Brian H. Pollock
E-mail: *brian@fairlawattorney.com*
Katelyn Schickman
E-mail: *katie@fairlawattorney.com*
FairLaw Firm
135 San Lorenzo Avenue, Suite 770
Coral Gables, Florida 33146
***Attorneys for Plaintiff***
***Served via CM/ECF and E-mail***

4919-9981-0911.4 / 086803.1072